# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**TERRILL BARNES, et al.,**

     **Plaintiffs,**

   **v.**          **Case No. 17-CV-355**

**DAVID J. CLARKE JR., et al.,**

     **Defendants.**

---

# ORDER

---

## Introduction

 Two lawsuits were filed relating to the April 24, 2016 death of Terrill Thomas while detained at the Milwaukee County Jail. On March 9, 2017, three of Thomas's children filed an action assigned case number 17-CV-355. Thomas's estate filed an action assigned case number 17-CV-1128 on August 14, 2017.

 On March 7, 2018, defendant Armor Correctional Health Services Inc. (Armor) filed a motion to stay in case number 17-CV-355. The same day it filed essentially the same motion in case number 17-CV-1128, which was joined by defendants James Ramsey-Guy, Nancy Evans, and Kashka Meadors. (Case No. 17-CV-1128, ECF No. 67.) Although they did not join in the motion to stay, defendants JorDon Johnson, Thomas

Laine, Dominique Smith and Kevin Nyklewicz joined in the moving defendants' reply briefs in Case No. 17-CV-355 (ECF Nos. 33 and 34). Milwaukee County subsequently expressed its support of the motion to stay filed in Case No. 17-CV-1128. (ECF No. 77.) Wisconsin County Mutual Insurance Company takes no position on the motion for stay, but argues that if the court stays the proceedings it should also stay Milwaukee County's third-party action against it. (Case No. 17-CV-1128, ECF No. 80.) Milwaukee County argues its third-party claim should be excluded from any stay. (Case No. 17-CV-1128, ECF No. 77.) It does not appear that the other 21 defendants have expressed an opinion on the motion to stay.

The cases were consolidated on April 9, 2018.

## FACTS

The following facts are taken from the complaint (ECF No. 1) in Case No. 17-CV-1128 and from the criminal complaints (ECF Nos. 68-1, 68-2, 68-3 and 68-4) submitted by Armor in support of the motion to stay in that case. The court accepts the allegations in the complaints as true for purposes of assessing the relationship between the civil and criminal proceedings.

Milwaukee police officers arrested Terrill Thomas on April 15, 2016. During the relatively brief period he was detained at the police station Thomas behaved erratically. (ECF No. 1, ¶¶ 41-42.) "He talked to non-existent persons, constantly and erratically moved about his cell, and verbalized incoherently." (ECF No. 68-1, ¶ 54.) He was

transferred to the Milwaukee County Jail early on April 16, 2016, and self-reported that he had a history of schizophrenia. (ECF No. 68-1, ¶ 55.) He was not taking his medications. (*Id.*) Based upon the recommendations of a nurse who conducted an initial health screening and a psychiatric social worker, Thomas was placed in a special-needs housing unit due to his known mental health needs. (ECF No. 1, ¶¶ 44, 46.)

Early on April 17, 2016, Kashka Meadors, a jail lieutenant, observed Thomas in his cell "shirtless, visibly agitated, and stuffing his shirt and torn pieces of his mattress into his toilet, causing the toilet to overflow and flood the cell." (ECF No. 1, ¶ 50.) Meadors ordered Thomas moved from the special-needs housing unit to the segregation unit where, contrary to written jail policy, Meadors ordered correctional officers James Ramsey-Guy, John Weber, and Dominique Smith to remove the mattress from Thomas's cell. ( ECF No. 1, ¶¶ 51, 53, 61-64.) Meadors's also ordered them to shut off the water supply to Thomas's cell, with which order Ramsey-Guy complied. (ECF No. 1, ¶ 63.)

Written jail policies require inmates to always have access to water. (ECF No. 1, ¶ 123; *see also* ECF No. 68-1, ¶ 11. a.) However, Meadors was unaware of this policy (ECF No. 68-3, ¶ 14. j.), and jail staff routinely turned off water to cells as a means of punishing inmates (ECF No. 1, ¶¶ 123-124), including when an inmate's unruly behavior did not include misuse of water (ECF No. 68-1, ¶¶ 60-61). Short of turning off all water to the cell, and thus denying Thomas access to drinking water, it would have

been possible to turn off only the water to the toilet in Thomas's cell (ECF No. 68-1, ¶¶ 27-28), but Meadors was not familiar with how the plumbing in the cells worked (ECF No. 68-3, ¶ 16. h.).

During his time in the jail Thomas was fed only "nutraloaf," "a mishmash of bland ingredients, blended and baked into a solid loaf," that was so dry the dust from it set off the fire alarm in Thomas's cell. (ECF No. 1, ¶¶ 58-59, 66, 89.) At least after the day he was put into segregation, Sunday, April 17, 2016, he was not provided any beverage along with his meals; his only source of hydration would have been the water tap in his room. (ECF No. 68-1, ¶ 39. a.)

Over the next week, contrary to jail policy, Thomas was never let out of his cell. (ECF No. 1, ¶ 67; *see also* ECF No. 68-1, ¶ 40.) For 24-hours a day he was locked in his cell without a mattress or blanket. (ECF No. 1, ¶ 16.) He was not allowed to shower. (ECF No. 1, ¶ 67.) He had no working toilet. (ECF No. 1, ¶ 67.) He was not able to communicate with family, and he was denied medical and mental health care. (ECF No. 1, ¶ 67.) And as would prove most significant, with the water to his cell turned off, he was denied drinking water. (ECF No. 1, ¶ 67.)

Despite other inmates informing jail officials that Thomas needed water, water was never provided to Thomas. (ECF No. 1, ¶¶ 88, 95, 96.) For example, on April 22 an inmate informed correctional officer Dominique Smith that Thomas needed his water

turned back on. (ECF No. 1, ¶ 88.) Dominique Smith took no action, saying, "It's shift-change." (ECF No. 1, ¶ 88.)

Over the first several days of his confinement in the segregation unit Thomas, at all hours of the day and night, engaged in extreme behavior—"naked, screaming, making nonsensical statements, chewing Styrofoam (from the box containing uneaten nutraloaf) and spitting it out, slapping his sandals together, licking the cell door window, and beating his fists against the walls of his cell." (ECF No. 1, ¶ 69.) This erratic behavior was observed by numerous jail officials, including Scott Sobek, Joshua Briggs, Steven Haw, Jeffrey Andrykowski, Meadors, Devonta Townes, Rafael Brito, Matthew Carroll, LeCarlin Collins, Brian Dragoo, Anthony Emanuele, JorDon Johnson, Thomas Laine, David Ledger, Joshua Legere, Devin O'Donnell, Ramsey-Guy, Decorie Smith, Dominique Smith, and John Weber. (ECF No. 1, ¶ 70.)

A psychiatric nurse, Karen Gray, visited the segregation unit daily and was aware of Thomas's serious medical and mental health needs but failed to secure care for him. (ECF No. 1, ¶ 71.) Another psychiatric nurse, Deborah Mayo, similarly observed Thomas "sitting on the floor, naked, facing the wall, acting strangely, and refusing to come to the door to talk," but took no action to provide him further medical care. (ECF No. 1, ¶ 91.) Amanda Ocacio, a licensed nurse practitioner, reportedly talked to Thomas numerous times during his incarceration but did not provide further care. (ECF No. 1, ¶ 72.) Karen Horton, M.D., the medical director for the Milwaukee County Jail, knew

that Thomas was suffering from diabetes and that his blood sugar was not being tested but did not personally examine Thomas or take steps to ensure he received care. (ECF No. 1, ¶ 73.)

As of April 23, 2016, "[h]e was simply lying naked on his cell floor, barely able to move, severely dehydrated, literally dying of thirst." (ECF No. 1, ¶ 92.) Another inmate informed Carroll that Thomas needed water, but Carroll did not provide any. (ECF No. 1, ¶ 95.) That same day another inmate told Johnson that Thomas needed water "now," but Johnson said he could not do anything because he was the only officer but would give Thomas water when another officer arrived about two hours later. (ECF No. 1, ¶ 96.) Johnson never provided Thomas with water. (ECF No. 1, ¶ 97.) The same inmate later told Laine that Thomas needed water. (ECF No. 1, ¶ 99.) Laine said Thomas was sleeping and did not need water. (ECF No. 1, ¶ 99.) The inmate responded to Laine, "If this man dies, it's going to be on your hands." (ECF No. 1, ¶ 99.)

Early on April 24, 2016, Decorie Smith, a correctional officer, observed Thomas lying naked on the floor of his cell. (ECF No. 1, ¶¶ 101-104.) Smith informed the shift lieutenant, Andrykowski, that Thomas did not seem right, but Andrykowski ignored this information. (ECF No. 1, ¶ 102.) During a later inspection of cells Smith attempted unsuccessfully to get Thomas's attention by shining his flashlight into the cell and kicking the door. (ECF No. 1, ¶ 103.) Smith did not further report his observations or attempt to summon help for Thomas. (ECF No. 1, ¶ 103.) Half-an-hour later, Smith

again attempted to get Thomas's attention and was again unsuccessful. (ECF No. 1, ¶ 104.) This time Smith reached into the cell and pulled on Thomas's foot but still got no reaction from Thomas, prompting Smith to radio master control and report Thomas's condition. (ECF No. 1, ¶ 104.)

Andrykowski, other officers, and medical staff responded only to find Thomas to be pulseless and not breathing. (ECF No. 1, ¶ 105.) Resuscitation efforts were unsuccessful and Thomas was pronounced dead at the scene. (ECF No. 1, ¶ 105.) An autopsy determined that Thomas died from "profound dehydration" and the medical examiner classified the death as a homicide. (ECF No. 1, ¶ 110.) Thomas had lost 34 pounds in the eight days he was incarcerated at the Milwaukee County Jail. (ECF No. 1, ¶ 109.)

An inquest jury in Milwaukee County Circuit Court on May 1, 2017 (ECF No. 68-2, ¶ 13) found probable cause to criminally charge Nancy Evans, Kashka Meadors, James Ramsey-Guy, Thomas Laine, John Weber, Dominique Smith, and JorDon Johnson with abuse of a prisoner, a felony.[1] (ECF No. 1, ¶ 112.)

On February 12, 2018, the Milwaukee County District Attorney's Office charged James Ramsey-Guy and Kashka Meadors with neglect of a resident of a penal facility (ECF Nos. 68-1, 68-3); *see also* Milwaukee Cnty Case Nos. 2018CF000673 and

---

[1] Wis. Stat. § 940.29 states: "Abuse of residents of penal facilities. Any person in charge of or employed in a penal or correctional institution or other place of confinement who abuses, neglects or ill-treats any person confined in or a resident of any such institution or place or who knowingly permits another person to do so is guilty of a Class I felony."

2018CF000672, available at wcca.wicourts.gov, and Nancy Evans with obstructing an officer and misconduct in office (ECF No. 68-2); *see also* Milwaukee Cnty Case No. 2018CF000671, available at wcca.wicourts.gov.

Armor, the corporation contracted to provide medical care to inmates at the Milwaukee County Jail and employing the healthcare workers at the jail, was criminally charged with seven misdemeanor counts of intentionally falsifying a health care record. (ECF No. 68-4); *see also* Milwaukee Cnty. Case No. 2018CM000748, available at wcca.wicourts.gov. The criminal charges against Armor relate to the alleged actions of three of its employees: Karen Gray, who is a defendant in this action, as well as Jennifer Henderson and De'Angelo McCoy. (ECF No. 68-4, ¶ 11.) Gray allegedly recorded that she attempted to assess Thomas's physical and mental health status on April 21, 2016, but Thomas refused to speak to her. (ECF No. 68-4, ¶ 18.) However, video shows that the closest Gray ever came to having contact with Thomas on that day was when she walked by his cell and, without breaking stride, looked in for a fraction of second. (ECF No. 68-4, ¶ 18. a.) Henderson reported twice checking Thomas's blood pressure on April 21, recording it as 152/84 with a pulse of 64 and later as 132/80 with a pulse of 104 (ECF No. 68-4, ¶ 19.) But video of Thomas's cell shows that no one ever checked Thomas's blood pressure on April 21. (ECF No. 68-4, ¶ 19.) McCoy recorded attempting to obtain blood from Thomas on the morning of April 22, but stated that Thomas did not respond. (ECF No. 68-4, ¶ 20.) However, video shows that McCoy never attempted

to speak with Thomas. (ECF No. 68-4, ¶ 20.) Three more charges against Armor relate to Gray allegedly falsely recording she provided care to three other inmates on April 21, 2016. (ECF No. 68-4, ¶¶ 25-27.)

## Analysis

It is well-established that a court may stay civil proceedings when, as a result of related criminal proceedings, "substantial and irreparable prejudice" would result absent a stay. *Estate of Swayzer v. Armor Corr. Health Servs.*, No. 16-CV-1703, 2018 U.S. Dist. LEXIS 53069, at *4 (E.D. Wis. Mar. 29, 2018) (quoting *CMB Exp., LLC v. Atteberry*, No. 4:13-cv-04051-SLD-JEH, 2014 U.S. Dist. LEXIS 116095, at *6 (C.D. Ill. Aug. 20, 2014); citing *Salcedo v. City of Chi.*, No. 09-cv-05354, 2010 U.S. Dist. LEXIS 67991, at *11 (N.D. Ill. July 8, 2010); *Chagolla v. City of Chi.*, 529 F. Supp. 2d 941 (N.D. Ill. 2008); *Mr. Dee's, Inc. v. Int'l Outsourcing Servs., LLC*, No. 08-C-457, 2008 U.S. Dist. LEXIS 93726 (E.D. Wis. Nov. 3, 2008); *Doe v. City of Chi.*, 360 F. Supp. 2d 880, 882 (N.D. Ill. 2005); *United States v. All Meat & Poultry Prods.*, No. 02 C 5145, 2003 U.S. Dist. LEXIS 17677, at *17 (N.D. Ill. Oct. 2, 2003). The risk of prejudice arises out of an individual's constitutional right not to incriminate himself. Concerned that his statements might incriminate him in the criminal matter, a defendant in a related civil proceeding might invoke the privilege in response to deposition questions or interrogatories or at trial, compromising his defense in the civil matter. *See Chagolla*, 529 F. Supp. 2d at 945.

However, the fact that a civil defendant might be faced with this choice does not automatically entitle him to a stay. *Chagolla*, 529 F. Supp. 2d at 945; *CMB Exp., LLC*, 2014 U.S. Dist. LEXIS 116095, at *6. There is nothing unconstitutional about forcing a defendant to choose between his privilege against self-incrimination and fully defending a civil action. *Admiral Ins. Co. v. Fed. Sec.*, No. 94 C 5649, 1996 U.S. Dist. LEXIS 3639, at *2 (N.D. Ill. Mar. 22, 1996) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976)). Moreover, as a corporation Armor does not enjoy a privilege against self-incrimination. *United States v. Kordel*, 397 U.S. 1, 7 n.9 (1970). Thus, with a corporation the concern is primarily whether witnesses central to its defense will remain silent lest they incriminate themselves, thereby depriving the corporation of evidence essential to its defense of the civil action.

A stay is appropriate "'when the interests of justice' require it." *Salcedo*, 2010 U.S. Dist. LEXIS 67991, at *5 (quoting *Kordel*, 397 U.S. at 12 n. 27). However, a stay is an exception reserved for special circumstances. *CMB Exp., LLC*, 2014 U.S. Dist. LEXIS 116095, at *5 (quoting *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 698, 2005 U.S. Dist. LEXIS 14437, at *8 (N.D. Ill. July 15, 2005); *United States v. Certain Real Property, Commonly known as 6250 Ledge Road, Egg Harbor, Wis.*, 943 F.2d 721, 729 (7th Cir. 1991)). It is the burden of the party seeking the stay to show that a stay is necessary. *CMB Exp., LLC*, 2014 U.S. Dist. LEXIS 116095, at *5 (quoting *Hollinger Int'l*, 2005 U.S. Dist. LEXIS 14437, at *8).

> Determination of whether to grant a stay due to parallel criminal litigation involves balancing the interests of the plaintiff, the defendants, and the public. The factors considered include the following non-exclusive list: whether the civil and criminal matters involve the same subject; whether the governmental entity that has initiated the criminal case or investigation is also a party in the civil case; the posture of the criminal proceeding; the effect of granting or denying a stay on the public interest; the interest of the civil-case plaintiff in proceeding expeditiously, and the potential prejudice the plaintiff may suffer from a delay; and the burden that any particular aspect of the civil case may impose on defendants if a stay is denied.

*Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *4-5 (quoting *Chagolla*, 529 F. Supp. 2d at 945).

### 1. Whether the civil and criminal matters involve the same subject

The felony charge against Ramsey-Guy and Meadors—neglect of a resident of a penal facility—is in some respects the criminal equivalent of the civil rights claim they face in this action. "[E]ach case is likely to share a common nucleus of operative facts …." *CMB Exp., LLC*, 2014 U.S. Dist. LEXIS 116095, at *8. Thus, notwithstanding nuances in elements and burdens, as regards Ramsey-Guy and Meadors the civil and criminal matters involve the same subject. Therefore, with respect to Ramsey-Guy and Meadors this factor weighs in favor of a stay.

The criminal charges against Evans relate to conduct occurring only after the events that form the basis for this action. Specifically, she is alleged to have failed to preserve video evidence and lied to investigators about whether a supervisor ever reviewed certain video recordings. (ECF No. 68-2.) As for the criminal charges against

Armor, the charges are significantly narrower than this action in that they relate only to seven instances over two days where Armor employees allegedly falsified inmate healthcare records. Three of the counts do not even relate to Thomas. Thus, as regards Armor and Evans, the court finds the overlap sufficient to weigh in favor of a stay but significantly less strongly than as to Ramsey-Guy and Meadors.

However, somewhat mitigating the weight of this factor is the fact that this civil action is significantly broader than the criminal cases, requiring the plaintiffs to prove facts and elements beyond that which is relevant in any pending criminal action. As a result, if viewed in the scope of all that is relevant to this action, the charged defendants' criminal liability is comparatively small.

### 2. Whether the governmental entity that has initiated the criminal case or investigation is also a party in the civil case

The State of Wisconsin, who is prosecuting the criminal cases, has no involvement in this action. Thus, this factor does not weigh in favor of a stay. *See Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *8.

### 3. The posture of the criminal proceedings

The fact that Ramsey-Guy, Meadors, Evans, and Armor are facing actual criminal charges, as opposed to cases where a party is facing merely the threat of criminal charges, weighs in favor of a stay. *See Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *9 (quoting *CMB Exp., LLC*, 2014 U.S. Dist. LEXIS 116095, at *8).

As to the pending criminal charges, although they have been pending for more than two months, each criminal case appears to still be in the early stages. According to electronically available court records, the defendants have requested additional time to review the case. No trial dates have been set. And there is no indication as to when a trial might be scheduled. Given the nature and enforcement mechanism of Wisconsin's speedy trial statute, *see* Wis. Stat. § 971.10, as well as the circumstances of the criminal prosecution, there does not appear to be any expectation that the cases will proceed along any particular timetable.

The fact that the criminal cases are in their early phases in some respects weighs in favor of a stay and in other respects weighs against a stay. It weighs against a stay insofar as it suggests that a stay would result in a lengthy and indeterminate delay of this action. *Cf. Tostado v. Jackson*, No. 10-CV-1162, 2011 U.S. Dist. LEXIS 56144, at *6 (E.D. Wis. May 25, 2011) ("The fact that the criminal case is nearing its conclusion – with a trial date set for mid-July 2011 – is also significant because it means any delay in the civil proceeding would be minimal, excepting a further delay in the criminal case."). But the fact that the criminal cases are in their early phases provides greater opportunities for the civil discovery process to be used to the detriment of the criminal defendants, which weighs in favor of a stay.

Ultimately, the court finds that the posture of the criminal cases weighs modestly in favor of a stay. *See Chagolla*, 529 F. Supp. 2d at 946 ("The fact that some of the

defendants face pending criminal charges weighs somewhat in favor of a stay, though perhaps not significantly, due to the likelihood of significant delay before the charges reach final disposition.").

### 4. The effect of granting or denying a stay on the public interest

The public interest also cuts both ways. "[T]he public has an interest in the prompt disposition of civil litigation, an interest that has been enacted into positive law through the Civil Justice Reform Act of 1990. *See* 28 U.S.C. §§ 471-82. A stay would impair that interest." *Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *10-11 (quoting *Salcedo*, 2010 U.S. Dist. LEXIS 67991, at *9); *see also* Fed. R. Civ. P. 1 (The Rules "should be construed, administered, and employed by the court and the parties to secure the just, *speedy*, and inexpensive determination of every action and proceeding." (emphasis added)). But the public also "has an interest in ensuring that the criminal process can proceed untainted by civil litigation." *Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *11 (quoting *Chagolla*, 529 F. Supp. 2d at 947).

In *Tostado v. Jackson*, cited by the moving defendants, the court noted, "Defendants posit that such interference could arise if civil discovery, including sworn testimony, is elicited while the criminal charges are still pending." 2011 U.S. Dist. LEXIS 56144, at *8. The court seemed to accept this notion, concluding without further explanation, "The public does have an interest in the effective prosecution of the defendant and, therefore, the court finds this factor weighs in favor of a stay." *Id.*

However, the moving defendants do not explain how a concurrent civil action necessarily undermines the public interest in the effective prosecution of the defendant.

The movants also argue that staying the civil action will foster judicial economy because of significant overlap in the cases. (Case No. 17-CV-1128, ECF No. 83 at 8 (quoting *All Meat & Poultry Prods.*, 2003 U.S. Dist. LEXIS 17677, at *14). The court does not see how going forward there are significant efficiencies to be achieved by a stay, and the defendants do not elaborate beyond the bald assertion. Efficiencies are most likely with respect to the investigative phase, whereby the parties in the civil action may ride on the coattails of the criminal investigators, or vice versa. But the court has no information that a criminal investigation is ongoing. Thus, delaying the civil action is not likely to yield any additional information for the parties here.

5. **The interest of the civil-case plaintiff in proceeding expeditiously and the potential prejudice the plaintiff may suffer from a delay**

"Plaintiffs obviously have a strong interest in having their cases resolved expeditiously and in obtaining prompt compensation for their injuries. *See Chagolla*, 529 F. Supp. 2d at 947. As time passes, evidence disappears and memories fade; plaintiffs' cases rarely grow stronger with delays beyond what is necessary for their adequate preparation." *Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *10.

The defendants argue that the plaintiffs' expressed interest in a quick resolution of this case is undermined by the fact that the first action was not filed until nearly a year after Thomas's death, and the second not until more than five months after that.

15

But of course some investigation is almost always necessary before a plaintiff can file a complaint based on well-grounded facts. *Cf.* Fed. R. Civ. P. 11. The amount of time that passed between Thomas's death and the filing of these lawsuits cannot be fairly characterized as demonstrating a lack of diligence on the part of the plaintiffs in pursuing their claims.

The plaintiffs also raise concerns about the continued solvency of Armor should an indefinite stay be granted. The plaintiffs do not much develop the argument and the court is not provided details as to Armor's financial circumstances. Arguing that it has been more than two years since Thomas's death and that any clients inclined to cut ties with Armor would likely have already done so, the movants respond (albeit only in a footnote) that the plaintiffs' view is "entirely speculative and, practically speaking, is likely moot." (Case No. 17-CV-355, ECF No. 33 at 10, fn. 3.)

The court acknowledges that the plaintiffs' concern is speculative. But the same can be said about many of the movants' arguments regarding the need for a stay. For example, the movants speculate that one or more witnesses will invoke the privilege against self-incrimination (*see, e.g.*, Case No. 17-CV-355, ECF No. 22 at 6 ("the individual movants and Armor's key officers and employees will likely assert the privilege out of an abundance of caution"); no witness has actually done so or even indicated that he or she will do so.

More importantly, the plaintiffs' concern is not unwarranted speculation. As the court understands Armor's business, it is dependent upon contracts with institutions. An institution may be significantly less likely to contract with a corporation that is facing criminal charges, much less one that has been criminally convicted of misconduct regarding the care it provided at another institution. The court finds no basis for concluding that the issue has become moot because it has been two years since Thomas's death. It is entirely possible that Armor's contracts simply have not been up for renewal in those two years.

Moreover, it has been only a few months since criminal charges were filed against Armor, and as the plight of other corporations (*e.g.*, Arthur Andersen) exemplify, criminal charges can be a game-changer for a corporation. If Armor were to lose contracts, its ability to pay any judgment might be significantly undermined, thereby denying the plaintiffs full compensation for any injuries they might prove at trial.[2] Additionally, the court notes that Armor's financial position is potentially imperiled by other ongoing litigation, which in this district alone includes other significant cases. *See, e.g., Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, and *Terry v. Cty. of Milwaukee*, No. 17-CV-1112-JPS, 2018 U.S. Dist. LEXIS 40522 (E.D. Wis. Mar. 13, 2018) (order denying Armor's motion for stay or bifurcation).

---

[2] Although Armor apparently has insurance, it admits that the plaintiffs do not view the policy limits as sufficient compensation: "Armor offered to attempt to obtain the policy limits. That offer was flatly rejected because, according to plaintiffs, the policy limits were of an insufficient amount." (Case No. 17-CV-355, ECF No. 30 at 6.)

The court finds that the plaintiffs' interests weigh strongly against a stay.

**6. The burden that any particular aspect of the civil case may impose on defendants if a stay is denied**

The moving defendants argue that, "[w]ithout a stay of the civil proceedings, individuals are faced with the prejudicial dilemma of surrendering their Fifth Amendment rights against self-incrimination, or not testifying and risking the possibility of adverse inferences being taken from the assertion of those Fifth Amendment rights." (Case No. 17-CV-1128, ECF No. 67 at 4.) Although compelling in some cases, that argument carries significantly less weight here.

This matter has already been the subject of a thorough criminal investigation. The individual defendants facing criminal charges—Ramsey-Guy, Evans, and Meadors—have already made extensive statements to investigators about Thomas's death. They have also testified under oath at an inquest into Thomas's death. Never to the court's knowledge did any charged defendant (or any other witness) invoke his or her privilege against self-incrimination. Thus, the court finds unpersuasive Armor's argument that witnesses inevitably will invoke the privilege. The defendants attempt to diminish the significance of the inquest testimony, noting that Ramsey-Guy testified for approximately 30 minutes, Meadors testified for less than one hour, and Evans testified for less than two hours. (Case No. 17-CV-355, ECF No. 33 at 10.) Although not approaching the sort of tedium often attending a civil deposition, the court finds that testimony of those lengths significant given the nature of this case.

The movants further argue that "it is not as if the Charged Defendants have now said all there is to say on the record and would have no need for the protections of the Fifth Amendment if deposed in this case." (Case No. 17-CV-355, ECF No. 33 at 10.) Undoubtedly, a witness can always say more. But once the central facts have been elicited, as they appear to have been, further testimony is often mere padding. The court is not persuaded that anything yet unsaid is likely to be crucial to any defense.

Armor also argues that its defense will be undermined because its "key officers and employees will likely assert the privilege out of an abundance of caution." (Case No. 17-CV-355, ECF No. 22 at 6.) However, as the plaintiffs note, there is certainly a question as to whether such witnesses plausibly face a risk of prosecution such that they would enjoy a privilege against self-incrimination. (Case No. 17-CV-1128, ECF No. 76 at 6.)

As for those individual defendants and witnesses who have not been charged but could be, the court presumes that each retains a privilege against self-incrimination (*e.g.*, the state has not granted anyone immunity). Although there is no indication that any criminal investigation is ongoing, the Milwaukee County District Attorney's Office may choose to pursue criminal charges in the future.[3] Thus, defendants and witnesses

---

[3] Armor notes, "there is nothing preventing the District Attorney's office from issuing Party to a Crime charges if information is elicited that establishes complicity by any of these individuals." (Case No. 17-CV-355, ECF Nos 30 at 5, 32 at 5.) Of course, "Party to a Crime" is not a criminal offense under Wisconsin law but rather a theory of criminal liability. *See* Wis. Stat. § 939.05. What substantive charge any defendant might face is unknown but the court presumes they may include those already filed.

may still reasonably fear prosecution. But the fear of future prosecution is not remedied by the resolution of the pending criminal charges against others. *See Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *13-14. Only upon the running of the statute of limitations is the fear of criminal prosecution relieved, which in Wisconsin is three years for misdemeanors and six years for most felonies, or which, because this case involves a death classified as a homicide, might never run. *Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *13-14. Thus, a stay would not remedy these concerns for uncharged defendants.

### Balancing

In balancing all the relevant factors the court's ultimate goal is to assess whether the interests of justice require a stay. *See Kordel*, 397 U.S. at 12 n. 27. Compared to the other two cases in this district where Armor recently sought a stay as a result of its pending criminal charges, *Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069; *Terry*, 2018 U.S. Dist. LEXIS 40522, the argument for a stay in this case is more compelling. Some defendants are facing actual criminal charges. The criminal cases all stem from Thomas's week in the Milwaukee County Jail, although the connection is more removed with respect to the charges against Evans, and Armor also faces charges stemming from actions regarding inmates other than Thomas.

But the plaintiffs and the public have a strong interest in ensuring that this case proceeds expeditiously. There is no timeline for the resolution of the criminal cases, and

the court finds that the plaintiffs' ability to both prove their case and recover damages if successful stands to be imperiled by an indefinite delay. There is also much to be said about the emotional impact of Thomas's family being forced to prolong their pursuit of redress for the alleged maltreatment of Thomas. *See Estate of Swayzer*, 2018 U.S. Dist. LEXIS 53069, at *10 (quoting *Doe*, 360 F. Supp. 2d at 882). The court finds no reason to believe that, absent a stay, the concurrence of civil proceedings stands to undermine the criminal proceedings or vice versa.

Although no witness has invoked or said that he or she will invoke the privilege against self-incrimination, for present purposes the court accepts that every individual witness will invoke the privilege against self-incrimination to the fullest extent permitted. Nonetheless, the moving defendants have not demonstrated that that will result in them being denied testimony essential to their defense. To the contrary, as a result of the thorough criminal investigation (where, to the court's knowledge, no information was withheld by way of an invocation of the privilege of self-incrimination), the facts are already well-established. Thus, to the extent that Armor's defense may depend upon the statements of witnesses, Armor is able to make use of this substantial record. Although a witness can always say more, the court has no hint that anything essential to the defense has been left unsaid.

Of course, if a witness invokes the privilege against self-incrimination, it may result in the jury in this civil action being instructed that it may draw an adverse

inference. *See Baxter*, 425 U.S. at 318. But the court shares the sentiment expressed by Judge Stadtmueller in response to this argument when made by Armor in another case—"so be it." *Terry*, 2018 U.S. Dist. LEXIS 40522, *3. Civil proceedings are not required to stop simply because a defendant is faced with this choice. *Chagolla*, 529 F. Supp. 2d at 945; *see also 6250 Ledge Rd.*, 943 F.2d at 729 (quoting *United States v. Little Al*, 712 F.2d 133, 136 (5th Cir. 1983)) ("The very fact of a parallel criminal proceeding, however, does not alone undercut [a defendant or claimant's] privilege against self-incrimination, even though the pendency of the criminal action force[s] him to choose between preserving his privilege against self-incrimination and losing the civil suit." (quotation marks omitted).) And the court is not required to relieve defendants of the consequences of this choice. *See Baxter*, 425 U.S. at 318. In light of the fact that the defendants have already made significant incriminatory statements when the consequence of criminal liability was squarely presented, it is doubtful the defendants will now invoke the privilege when the consequence is an adverse inference. Even if they do invoke the privilege, it is doubtful that the adverse inference will be particularly prejudicial in light of the defendants' prior self-incriminating statements.

The moving defendants offer largely unadorned conclusions that their "ability to successfully defend this case will be significantly impaired" and "will suffer irreparable harm" absent a stay. (Case No. 17-CV-355, ECF No. 30 at 3.) But these bald assertions are left unsupported. Consequently, the court finds that the moving defendants have

failed in their burden to show that they will suffer substantial and irreparable prejudice if a stay is not granted.

**IT IS THEREFORE ORDERED** that the motions to stay (Case No. 17-CV-355, ECF No. 21 and Case No. 17-CV-1128, ECF No. 66) are **denied**.

Dated at Milwaukee, Wisconsin this 4th day of May, 2018.

WILLIAM E. DUFFIN
U.S. Magistrate Judge